**FILED**
**June 9, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **R.G.**

**No. 20-0509** (Harrison County 19-JA-15-3)

**MEMORANDUM DECISION**

This child abuse and neglect proceeding involves R.G.,[1] an eleven-year-old boy with special needs. The Department of Health and Human Resources (DHHR) and the child's guardian ad litem (guardian) appeal the June 15, 2020 order of the Circuit Court of Harrison County imposing what is commonly called a "section 5" disposition under West Virginia Code § 49-4-604(c)(5)[2] to Respondent I.W., the child's father. The DHHR and the guardian argue that the circuit court should have terminated the parental rights of the father when he refused to participate in services to correct the conditions of abuse and neglect, and where termination of his parental rights was necessary for the child's welfare. The father contends that the circuit court acted within its discretion by imposing a section 5 disposition because the child's mother was previously granted the same disposition years earlier.

This Court has considered the parties' briefs, oral argument, and the record on appeal.[3] Because this case presents no substantial question of law, it satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is appropriate

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2] West Virginia Code § 49-4-604(c)(5) provides, in part:

Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the care, custody, and control of the department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court.

When the petition was filed in this matter, the dispositional alternatives currently contained in West Virginia Code § 49-4-604(c) were codified at § 49-4-604(b). All references here are to the current version of the statute, the text of which was not altered from the 2016 version.

[3] The father is represented by Julie N. Garvin, Esq. The DHHR is represented by Caleb A. Seckman, Esq., Assistant Solicitor General. The child's guardian is Allison S. McClure, Esq.

1

for a memorandum decision. As explained below, we agree with the DHHR and the guardian's contention that the circuit court abused its discretion when it failed to terminate the father's parental rights. So, we reverse the decision of the circuit court and remand this case for entry of an order consistent with this decision.

## I. Factual and Procedural History

This appeal concerns the parental rights of the child's father. But we begin by discussing the proceedings against the child's mother and her disposition as that was the focus of the circuit court's ruling and the father's argument in this case.

Although the record is not before us, the parties state that in 2014 the DHHR filed a child abuse and neglect petition against the child's mother, T.G. After the circuit court adjudicated her as an abusing/neglectful parent in 2015, it imposed a section 5 disposition and placed the child with his father.[4] The child then lived with his father and the paternal grandmother. The paternal grandmother passed away about three years later, and the child remained in the care of his father.

In February of 2019, the DHHR filed the child abuse and neglect petition that is the subject of this appeal against the father after obtaining emergency custody of the child. The DHHR alleged that the father failed to provide the child with a safe and stable home, subjected the child to unsanitary and unsafe conditions, and neglected the child's educational and medical needs.[5] The circuit court held a preliminary hearing and granted the father a preadjudicatory improvement period. As part of the improvement period, the child was returned to the father's physical care.

---

[4] *See* § 49-4-604(c)(5) at note 2, *supra*. While the parties label the child's placement with his father at the conclusion of the mother's proceeding as a section 5 disposition, the child was not placed in a guardianship—a natural fit parent is not a guardian appointed by the court. Because the child was placed in the "permanent sole custody of the nonabusing parent," it appears that the circuit court conducted the mother's disposition under § 49-4-604(c)(6) but did not terminate her parental rights. West Virginia Code § 49-4-604(c)(6) provides, in part, that:

> Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency.

[5] Specifically, the DHHR stated that on February 6, 2019, the father went to a DHHR office and requested that it take custody of his child. The father reported that he had been kicked out of two homes due to the child's behavioral issues and had to sleep in a vehicle and a tent; the father claimed that the child was so "bad" that no one would babysit him, preventing the father from maintaining employment; the father stated he could not remember the last time the child had been in school; and the father stated that he could not provide basic needs for the child. The next day, the father returned to the DHHR office and a Child Protective Services ("CPS") worker obtained emergency custody of the child.

The DHHR filed an amended petition in April of 2019, and alleged that five days after regaining physical placement of the child, the father contacted a CPS worker and stated that he could not care for the child because the owner of the home where they were staying, G.C., wanted the child to leave. The father and his girlfriend had the child and his belongings waiting for the CPS worker at a public location. The CPS worker retrieved the child[6] and contacted G.C. to verify the father's statement; G.C. reported that he did not tell the father the child was no longer welcome in the home. The DHHR also alleged that the father was discharged from parenting and adult life skills classes for noncompliance, failure to attend his psychological evaluation, and leaving a Multidisciplinary Team (MDT) meeting early due to his frustration with the proceeding. It further alleged that the father submitted to only one drug screen, testing positive for marijuana use, and had missed six screens.

In a second amended petition filed in May of 2019, the DHHR alleged that school officials reported that the child came to school angry, aggressive, and unprepared when residing with the father. The DHHR also alleged that the child's uncle reported that he allowed the father, his girlfriend, and the child to reside with him for a period of time in 2018 after he learned they were living in a tent. The uncle informed the DHHR that the father did not contribute to household expenses, had angry outbursts, caused damage to the property, and did not take the child to the doctor for medication management of the child's Attention Deficit Hyperactive Disorder (ADHD).

The circuit court held an adjudicatory hearing in May of 2019. A CPS worker testified that the child lacked a stable living situation when he was in his father's care. A DHHR worker also testified to the circumstances leading to the petition's filing, including how the father attempted to surrender the child and blamed the child for the father's lack of housing and employment.

The father testified and admitted to missing a drug screen due to a lack of transportation. Then, because he was "marked positive for everything in the book" for missing a screen, the father stated that he "didn't want to go to any more of those drug screens because that was not even my fault for the reason I missed." The father acknowledged that changing residences so often was not good for the child but blamed his housing issues on his mother's passing and his brothers for kicking him out of their homes. The father denied neglecting the child and claimed that he had done nothing wrong.

The child's pediatrician testified that the child had struggled with ADHD and behavioral issues from a young age. And given the child's attention and behavioral issues, it was important that he maintain a stable, consistent environment.

The circuit court reconvened the adjudicatory hearing in August of 2019. A worker at the local Day Report Center testified that the father tested positive for marijuana on two occasions and failed to submit to any drug screens thereafter.

---

[6] The child was placed with his paternal uncle, D.H.

The principal at the child's school testified about the child's behavior. She stated that the child had a history of extreme behavioral issues and that, prior to the proceedings, he had to be removed from a traditional classroom and was provided a behavior intervention plan. Due to the father's inconsistent living situation, the child had been removed from the school for some time, but was re-enrolled by his uncle. The principal testified that the child's behavior improved while he was residing with his uncle.

One of the father's brothers, J.H., testified regarding the father's homelessness and volatile behavior in front of the child. According to J.H., the father and child lived with him for a period of time, and he observed that the father failed to adequately provide for the child's medical needs. On one occasion, the father quit his job and bought an expensive video gaming system. And on other occasions, the father would scream about harming or killing himself in front of the child. J.H. testified that he asked the father to move out of his home because he did not feel that the father was going to improve himself; this request had nothing to do with the child's behavior. D.H., the father's other brother who had placement of the child, also testified as to the father's poor behavior and how he threatened to commit suicide in front of the child. While the child's uncles testified about the father's extreme emotional outbursts, no one indicated that the father had a diagnosed mental health disorder or disability.

The DHHR's final witness was another CPS worker who testified that the father failed to participate in his preadjudicatory improvement period. The father failed to regularly submit to drug screens, failed to participate in parenting or adult life skills classes, did not seek to visit the child, and failed to maintain contact with the DHHR. [7]

The father testified again and denied the allegations against him. The father disputed his brothers' claims that he yelled or threatened to kill himself in front of the child. He blamed the DHHR and a lack of transportation for his failure to participate in services but conceded he never asked for transportation assistance. The father denied any wrongdoing and when asked whether he had any issues he needed to address responded, "No." The father tested positive for marijuana use immediately following the hearing.

The circuit court adjudicated the father as an abusing parent by order entered on September 18, 2019. It found that the father failed to provide a safe and stable home for the child when he moved the child from place to place and, on at least two occasions, resided in a tent or a car. The circuit court found that the father's outbursts and threats of self-harm in the child's presence were detrimental and emotionally damaging to the child. The circuit court further found that the father used his funds for drugs rather than providing for his child. It also noted that the father failed to complete the terms and conditions of his preadjudicatory improvement period.

The guardian submitted a report in September of 2019 recommending termination of parental rights. She highlighted the fact that the father returned the child to the DHHR after only one week of the child being returned to his care as part of the preadjudicatory improvement period. She also noted that the father was hostile to service providers and did not participate in visits with

---

[7] The father requested to visit with the child on one occasion, but he failed to respond to the CPS worker who attempted to set up the visit.

4

the child. The guardian stated that there is no possibility for improvement due to the father's refusal to participate in services.

At a dispositional hearing held in September of 2019, a CPS worker testified that the father failed to participate in any services following the adjudicatory hearing. She further testified that the father ignored her attempts to contact him and failed to maintain any contact with the DHHR. The worker reported that the child requested phone calls with the father on some occasions and that he appeared to enjoy the calls. But sometimes, the child went into "a rage," lasting for hours after talking with his father. The CPS worker also described how the father was argumentative during MDT meetings and threatened self-harm. The CPS worker recommended termination of the father's parental rights considering the child's special needs and the father's unwillingness or inability to provide necessary stability.

Following arguments, the circuit court considered the available dispositions under West Virginia Code § 49-4-604(c). When speaking about a section 5 disposition, the circuit court questioned the DHHR as to whether any accommodations had been made in accordance with the Americans with Disabilities Act (ADA).[8] Both the DHHR and the guardian responded that the father never requested any accommodations, nor had there been any evidence that he suffered from a disability that would fall under the ADA. The circuit court also expressed concern that the DHHR and the guardian had taken contradictory positions by recommending termination of the father's parental rights but not opposing post-termination contact with the child.

Ultimately, the circuit court imposed a section 5 disposition even though it found that the father failed to satisfy the terms of his preadjudicatory improvement period and denied any responsibility for the issues that led to the filing of the petition. It further found that the father did not visit with the child during the proceedings and failed to respond to the CPS worker's attempt to contact him after August of 2019. The circuit court held that the father was presently unwilling or unable to provide for the child's needs but that termination was not necessary for the child's welfare because the child's mother was in a section 5 disposition. It also allowed the child to have post-disposition contact with the father at the discretion of the legal custodian. The DHHR and the guardian appeal the June 15, 2020, disposition order.[9]

---

[8] West Virginia Code § 49-4-604(c)(5) provides that the "court order shall state: . . . (C) Whether the department has made reasonable accommodations in accordance with the Americans with Disabilities Act of 1990, 42 U. S. C. § 12101 *et seq.*, to parents with disabilities in order to allow them meaningful access to reunification and family preservation services[.]"

[9] The guardian filed a status update in April of 2021, under Rule 11(j) of the West Virginia Rules of Appellate Procedure, stating that the child remains in the care of his paternal uncle. While the child's mother, T.G., remains in a section 5 disposition, the DHHR and guardian filed a "Joint Motion to Modify Disposition of Respondent, T.G., based on T.G.'s continued substance abuse issues, repeated incarcerations, and recent involuntary termination of parental rights to R.G.'s younger sister." The current permanency plan for the child is legal guardianship with his paternal uncle. But the guardian states that if this appeal is successful and the motion to modify disposition of the child's mother is granted, the permanency plan for the child will change to adoption by the paternal uncle.

## II. Standard of Review

Our review of dispositions in abuse and neglect cases is well-settled:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."[10]

With this standard in mind, we turn to the parties' arguments.

## III. Analysis

The DHHR and the guardian argue that the circuit court erred in imposing disposition under West Virginia Code § 49-4-604(c)(5) rather than terminating the father's parental rights when he failed to participate in services to correct the conditions of abuse and neglect, made no efforts to improve, and showed no interest in visiting with his child during this case. The DHHR states that "[t]here is no basis in the record for the imposition of an alternative disposition." Similarly, the guardian contends that "[e]very bit of evidence before the [c]ourt supported a finding that the termination of parental rights was necessary" under § 49-4-604(c)(6).[11] The father responds that the circuit court acted within its discretion by imposing the alternative disposition considering that the child's mother was previously granted the same disposition.

We have previously held that

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West

---

[10] Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011) (quoting Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

[11] For purposes of brevity, we consolidate the assignments of error raised by the DHHR and the guardian.

6

Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected."[12]

West Virginia Code § 49-4-604(d) provides a non-exclusive list of circumstances that define the phrase, "No reasonable likelihood that conditions of neglect or abuse can be substantially corrected" including when

> (2) The abusing parent or parents have willfully refused or are presently unwilling to cooperate in the development of a reasonable family case plan designed to lead to the child's return to their care, custody and control;

> (3) The abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health, or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare, or life of the child.[13]

The father's conduct throughout these proceedings falls squarely within the parameters listed above. He refused to cooperate with the DHHR, did not participate in rehabilitative services, failed to submit to a psychological evaluation, failed to engage in the drug-testing process except for a few occasions where he tested positive, and failed to respond to or maintain contact with the service providers. This Court has held that in order to correct a condition of abuse and/or neglect, a parent must first be able to acknowledge the problem.[14] But the father made it clear that he did not believe he had done anything wrong and that he should not have to comply with an improvement period to be reunited with his child.

After applying the applicable statutory language to the facts found by the circuit court, we agree with the DHHR and the guardian that a section 5 disposition was not appropriate. The clear and convincing evidence presented by the DHHR showed "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" on the part of the father despite having been offered numerous services throughout his improvement period. We have previously held that "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously

---

[12] Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)).

[13] W. Va. Code §§ 49-4-604(d)(2)-(3).

[14] *See In re N.R.*, 242 W. Va. 581, 598, 836 S.E.2d 799, 816 (2019) (holding circuit court abused its discretion when imposing a section 5 disposition instead of terminating parental rights when there had not been a full acknowledgement of the violence, danger and harm to the children by either parent; "in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable[.]") (quoting *W. Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 498, 475 S.E.2d 865, 874 (1996)).

threatened."[15]  "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."[16]

Under similar facts, this Court reversed the circuit court's order granting the mother a section 5 disposition in the case of *In Kristin Y.*, and remanded with directions to enter an order terminating her parental rights.  We stated that,

> a parent's participation in an improvement period is a clear indicator of the parent's future potential for success and willingness to make the necessary changes to become a fit and suitable parent.  [The mother's] sporadic cooperation with service providers, her inability to complete a course of parent education over a 15-month period and her failure to fully cooperate with the Department, provide sufficient grounds for the finding that the conditions of neglect or abuse cannot substantially be corrected.[17]

The facts in this case are more egregious than the facts in *Kristin Y.* because the mother in that case at least had some compliance with the terms of her improvement period.  But here, the father was entirely uncooperative with the service providers, made no efforts to improve the conditions of abuse or neglect, failed to take responsibility for his actions, and showed no interest in visiting with his child.

Based on this record, the father does not advance the argument that there is a reasonable likelihood that he can correct the conditions of abuse or neglect in the near future.  Instead, he focuses on the second prong of § 49-4-604(c)(6) and reasons that termination of his parental rights is not "necessary for the welfare of the child" because the only permanency plan available to the child at disposition was legal guardianship with the paternal uncle and not adoption.  He notes that the DHHR had not attempted to modify the mother's disposition during the pendency of this case, although the guardian advises this Court that she and the DHHR recently made a joint motion to do so.[18]  In any event, the father's argument is contrary to this Court's prior holding that the West Virginia Code permits the termination of one parent's parental rights while leaving the rights of the other parent intact.[19]  The key to determining whether a parent should maintain his or her parental rights is not the status of the other parent, but whether the offending parent has rectified the conditions of abuse or neglect.[20]

---

[15] Syl. Pt. 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

[16] Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

[17] 227 W. Va. at 571, 712 S.E.2d at 68.

[18] *See* note 9, *supra*.

[19] *In re Emily*, 208 W. Va. 325, 344, 540 S.E.2d 542, 561 (2000).

[20] *Id*.

8

The father also fails to acknowledge that disposition under West Virginia Code § 49-4-604(c)(5) is expressly meant to be a temporary situation:

> Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child *temporarily* to the care, custody, and control of the state department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court.[21]

The DHHR and the guardian contend that evidence proves that termination of the father's parental rights is in the child's best interest and a step toward permanency and possible adoption. We agree. It is undisputed that the child has special needs and substantial evidence was presented that in order to meet those needs, the child requires a high level of stability in his life that the father has neither the ability nor the desire to provide. "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided."[22] So, termination of the father's parental rights is the proper option under § 49-4-604(c)(6), and when "it is necessary to remove the abused/and or neglected child from his or her family, an adoptive home is the preferred permanent out-of-home placement of the child."[23]

The DHHR and the guardian next argue that the circuit court erred by finding that their recommendation of termination of the father's parental rights was inconsistent with a lack of an objection to the father's request for post-termination visitation.[24] Again, we agree. Post-termination visitation is neither inconsistent with, nor a barrier to, termination of parental rights. In syllabus point five of *In re Christina L.*,[25] this Court held that post-termination visitation may be appropriate in cases when the child has a bond with the parent:

> When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among

---

[21] *Id.* (emphasis added); *see In re I.A.*, 19-0152, 2019 WL 2451150, at *3 (W. Va. Jun. 12, 2019) (memorandum decision) ("What petitioner fails to recognize is that this dispositional alternative [under West Virginia Code § 49-4-604(c)(5)] provides only for a temporary placement for the child[.]").

[22] Syl. Pt. 7, *In re J.G.*, 240 W. Va. 194, 809 S.E.2d 453 (2018) (quoting Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948)).

[23] Syl. Pt. 2, in part, *State v. Michael M.*, 202 W. Va. 350, 504 S.E.2d 177 (1998).

[24] The DHHR worker stated that she did not oppose post-termination contact because she did not want to further upset the child by eliminating his routine of occasional, supervised telephone calls with his father.

[25] 194 W. Va. 446, 460 S.E.2d 692 (1995).

other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.[26]

In this case, the circuit court stated that the child "may be permitted post-dispositional contact" with the father if "the child requests the contact" and "the contact is deemed to be in the child's best interests by his legal custodian, with input from the child's counselor/therapist, if any," as well as other specifications. The circuit court erred when it left the issue of visitation to the discretion of the child's legal custodian without taking evidence, hearing arguments, and making specific findings of fact on that issue.[27] On remand the circuit court is directed to conduct further proceedings on this issue to consider the factors established in *In re Christina L.*

The DHHR and the guardian finally contend that the circuit court erred by finding that the DHHR failed to make reasonable efforts to provide the father services under the ADA when there was no indication that he needed an accommodation; and any need for this accommodation could not be determined because the father refused to participate in the proceedings.[28] Again, we agree. There is no evidence that the father has a disability that would qualify for accommodations under the ADA. In addition, he made no request for accommodation or services and refused the services that were offered by the DHHR.

## IV. Conclusion

For the reasons set forth above, we reverse the June 15, 2020 order of the Circuit Court of Harrison County and remand this matter with directions to enter an order terminating Respondent I.W.'s parental rights and hold proceedings to consider whether post-termination visitation is appropriate. The Clerk is directed to issue the mandate contemporaneously herewith.

---

[26] This continued contact is a right of the child, not a right of the parent. *Id*. at 455 n.9, 460 S.E.2d at 701 n.9.

[27] *See* Syl. Pt. 5, *In re Marley M.*, 231 W. Va. 534, 745 S.E.2d 572 (2013) ("A parent whose rights have been terminated pursuant to an abuse and neglect petition may request post-termination visitation. Such request should be brought by written motion, properly noticed for hearing, whereupon the court should hear evidence and arguments of counsel in order to consider the factors established in Syllabus Point 5, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995), except in the event that the court concludes the nature of the underlying circumstances renders further evidence on the issue manifestly unnecessary."). Rule 15 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides, in part: "The effect of entry of an order of termination of parental rights shall be, inter alia, to prohibit all contact and visitation between the child who is the subject of the petition and the parent who is the subject of the order and the respective grandparents, *unless the Court finds the child consents and it is in the best interest of the child to retain a right of visitation.*" (Emphasis added).

[28] The father does not respond to this assignment of error in his summary response.

Reversed and remanded.

**ISSUED**:  June 9, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton